UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SPECTRUM HEALTH, INC.

        Plaintiff,

v.                                       Case No. 1:08-CV-182

GOOD SAMARITAN EMPLOYERS        HON. GORDON J. QUIST
ASSOC., INC. TRUST FUND, et al.

        Defendants.
_____/

**OPINION**

**<u>INDEX</u>**

I.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B.    Procedural Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.    Effect of Procedural Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.    Spectrum's Claim for Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    Alleged Billing Errors (Reason code "A"). . . . . . . . . . . . . . . . . . . . . 13
        2.    Bundled Charges (Reason Code "G"). . . . . . . . . . . . . . . . . . . . . . . . . 14
        3.    Reasonable and Customary Charges (Reason Codes "B", "C", "D" and "E")
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    E.    Counterclaim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    F.    Attorney's Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    Culpability or Bad Faith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    Defendants' Ability to Pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        3.    Deterrence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        4.    Does Spectrum Seek to Confer Common Benefits or Resolve a Significant Question of ERISA Law?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        5.    Relative Merits of the Parties' Positions. . . . . . . . . . . . . . . . . . . . . . . 23

III.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

*Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 621-22 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 11

*Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 5

*Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 531 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . 22, 23

*Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631-34 (10th Cir. 2005). . . . . . . . . . . . . . . . . . 9

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S. Ct. 708, 712 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hunter v. Caliber System, Inc.*, 220 F.3d 702, 709-10 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 5

*Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1103-1107 (9th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S. Ct. 2063, 2069 (1993). . . . . . . . . . . . . . 18

*Moon v. Unum Provident Corp.*, 461 F.3d 639, 645 (6th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . 23

*Nicholas v. Prudential Ins. Co. of Am.*, 406 F.3d 98 (2nd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 9

*Perry v. United Food & Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995). . . . 6

*Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d 779, 790 (S.D. Ohio 2008). . . . . . . . . . 9, 10

*Schwartz v. Oxford Health Plans, Inc.*, 175 F. Supp. 2d 581 (S.D.N.Y. 2001).. . . . . . . . . . . . . . 12

*Sec'y of the Dept. Of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985).. . . . . . . . . . . . . . . . . . . 21

*Sereboff v. Mid-Atlantic Medical Services, Inc.*, 547 U.S. 356, 126 S. Ct. 1869 (2006).. . . . . . . 18

*Soltysiak v. Unum Provident Corp.*, 2006 WL 2884461, at *2 (W.D. Mich. Oct. 10, 2006). . . . 11

*Univ. Hosps. of Cleveland v. South Lorain Merchs. Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 434-35 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 615 (6th Cir. 1992). . . . . . . . . 11, 14

*Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). . . . . . . . . . . . . . . . 5

29 C.F.R. § 2560.503-1(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

29 C.F.R. § 2560.503-1(h)(2)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

29 C.F.R. § 2560.503-1(h)(3)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 C.F.R. § 2560.503-1(h)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 C.F.R. § 2560.503-1(i)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

29 C.F.R. § 2560.503-1(i)(2)(iii)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

29 C.F.R. § 2560.503-1(i)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

29 C.F.R. § 2560.503-1(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 C.F.R. § 2560.503-1(l) (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 U.S.C. § 1001... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1132(a)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 U.S.C. § 1132(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1044 (5th ed. 1941). . . . . . . 18-20

*Restatement of Restitution* § 20 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

## OPINION

Spectrum Health, Inc. (Spectrum) filed suit against Good Samaritan Employers Association, Inc. Trust Fund (the "Trust"), Good Samaritan Employers Association, Inc. (Good Samaritan) and Medical Benefits Administrators of MD, Inc. (MBA) seeking payment of $62,434.46 for the unpaid portion of a medical benefits claim Spectrum filed with Good Samaritan. Defendants filed a counterclaim against Spectrum seeking the return of an alleged overpayment of $35,632.47 they allege they discovered during review of Spectrum's claim on administrative appeal. Each party filed a Cross Motion for Judgment on the Administrative Record. Spectrum also filed a Motion to Dismiss Defendants' Counterclaim Under Rule12(b)(6) or Rule 12(c) and/or For Summary Judgment on the Counterclaim Under Rule 56. For the following reasons, Spectrum's motion to dismiss is granted, its motion for judgment on the administrative record is granted, and Defendants' motion for judgment on the administrative record is denied.

## I.    Procedural History

Spectrum provided medical care to Audrey Hartzell, a newborn infant born several months prematurely. Hartzell was a beneficiary in an Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et. seq.*, plan (the "Plan") issued by the Trust and administered by MBA. ERISA sets minimum standards for a variety of employee benefits, including health insurance, disability insurance and pensions. Spectrum filed a claim with MBA seeking payment of $381,371.94 for the care it provided Hartzell. MBA forwarded the claim to Principal Performance Group (PPG), an external claims auditor, where the claim was audited by Robert Frost. MBA adopted PPG's analysis and paid Spectrum $318,934.40. On April 17, 2003, MBA sent Spectrum a letter informing Spectrum the balance of $62,437.54 was not covered. A nine-page spreadsheet listing each charge

1

was enclosed.  (A.R. at 559-69.)[1]  Each disputed or rejected charge was accompanied by one or more reason codes, each of which corresponded to a terse, cryptic explanation for the denial.

Spectrum appealed the adverse benefit determination on July 30, 2003.  Spectrum received no response and sent MBA a second letter of appeal on December 19, 2003.  Spectrum noted that MBA never requested a "chart copy" and stated that the denial of "charges that are clearly documented in the paper chart indicates that an effective audit was NOT completed." (*Id.* at 578-79 (emphasis in original).)  In a letter dated April 12, 2004, MBA stated the matter was closed from further administrative review.  MBA asserted that Spectrum's initial correspondence was merely an "unsigned generic protest letter," not an appeal, and that Spectrum's subsequent letter was "not only untimely, but also yet another unsupported attempt to gain additional funding."  (*Id.* at 592-93.)

Spectrum filed suit in state court on June 30, 2004 under ERISA and state law, seeking $62,434.46 in unpaid medical charges.  Good Samaritan removed the case to federal court, where Spectrum prevailed on a motion to remand.  The Kent County Circuit Court, State of Michigan, denied both parties' motions for judgment on the administrative record, dismissed the suit without prejudice, and remanded Spectrum's claim to MBA for consideration of Spectrum's administrative appeal.  (*Id.* at 433-38.)

On November 29, 2006, MBA sent Spectrum a notice of adverse benefit determination pursuant to the state court's order.  The notice stated that disputed or rejected charges were "denied due to apparent billing errors or overcharges exceeding this ERISA Plan's reasonable and customary guidelines." (*Id.* at 481.)  It provided the Summary Plan Description's definition of "reasonable and customary charges."  (*Id.* at 481-82.)  The notice contained a spreadsheet of accepted and rejected

---

[1]  References to the administrative record will be designated "A.R."

2

charges virtually identical to the spreadsheet MBA provided in 2003 when it originally denied a portion of Spectrum's claim.  Nine reason codes summarily specified why each denied or disputed charge was rejected.  A statement of the documents or information Spectrum "ha[d] to furnish" to "perfect its claim for benefits" accompanied each code.  The notice also stated "Spectrum must furnish copies of its PPO and insurance company agreements . . . and its charge master for all pharmaceuticals and supplies."  (*Id.* at 482-83.)  MBA did not explain why the documents were necessary, however.  (*Id.* at 483.)  The notice described the pricing sources MBA used to adjudicate Spectrum's claim, including REDBOOK, American Hospital Directory, Physicians' Fee Reference, and information obtained from numerous other industry sources.  (*Id.* at 484.)  It also stated, "[m]ost providers have access to the above-mentioned sources of information. If not, it [sic] is available in the market place for purchase from the organizations that own it and license it."  (*Id.* at 484.)

Spectrum appealed this second adverse determination on May 23, 2007.  In a 24-page letter it argued, among other things, that the adverse benefit determination "ignore[d] the Plan's definition for calculating reasonable and customary charges, . . . fail[ed] to provide evidence that the Plan's outside claim services . . . relied on - or was even aware of - the Plan's definition, . . . arbitrarily cherry pick[ed] varying criteria for . . . reasonable and customary determinations," and did not provide "a reasoned explanation for" the denial or support it "with competent evidence." (*Id.* at 465-66 (internal quotations omitted).)  Spectrum asserted the claims processor "should have culled research regarding . . . the general level of charges made by others rendering or furnishing the same such services, medicines or supplies within the area in which Spectrum's charges were incurred" and based its adverse benefit determination on that data, but instead used "no less than eight (8) varying standards or definitions of reasonable and customary charges." (*Id.* at 471 (internal quotations omitted).)  Spectrum contended that MBA's reliance on comparators such as

3

REDBOOK's Average Wholesale Price, 110% of list price, and "varying cost/charge ratios of the Center for Medicare-Medicaid Services" did not satisfy the Plan's definition. (*Id.* at 471-72.) It also argued that MBA had not offered any evidence that its use of the Physicians' Fee Reference established "the general level of charges . . . within the area." (*Id.* at 477.)

MBA forwarded the appeal and supporting documents to PPG, and Mr. Frost once again undertook the review. (*Id.* at 813.) On July 17, 2007, MBA notified Spectrum the appellate review was underway. (*Id.* at 801.) Although this letter requested the medical records, it did not refer to the information MBA had requested in its November 29, 2006 notice of adverse benefit determination. Spectrum provided the medical records on August 3, 2007. Mr. Frost audited the claim using the medical records and the materials previously provided. According to this analysis, Good Samaritan overpaid Spectrum by $35,632.47. PPG informed MBA that the review of the medical records indicated "there were two 'step-downs' in service to the patient as her health improved. . . . [t]he patient should have been downgraded in severity each time and the room rate reduced to reflect less acute care." (*Id.* at 810.) PPG

> adjust[ed] the room rate to reflect the hospital's own 'cost to charge' . . . which we now do as a matter of protocol. . . . This has changed what should have been the reimbursable amount considerably, in our opinion. Further, we could argue that a further reduction is appropriate because of the step-down in care.

(*Id.* at 810-11.)

MBA sent Spectrum the revised audit report on October 17, 2007, stating the covered charges were $283,304.93, not the $318,934.40 MBA had determined in its previous two analyses. MBA informed Spectrum it had "the right to submit additional information or documents with which to contest or rebut the audit report. . . . If [you] elect[] to do so, that information will be considered as a part of the administrative record . . . [otherwise] the administrative record will be closed and

4

the appeal will be decided based upon the existing record." (*Id.* at 824.)  The revised audit report contained a spreadsheet very similar to that in the previous analyses, using the same reason codes previously employed.  (*Id.* at 825-32.)

Spectrum notified MBA it received the revised audit report on November 6, 2007.  In this letter Spectrum objected to MBA's "impermissibl[e] attempt[] to increase the amount of disputed charges" from $62,434,46 to $98,067.01, confirmed that Spectrum "will not . . . need not and should not submit additional information or documents," protested that MBA's response was "long overdue," and informed MBA that Spectrum would "wait until December 31, 2007 to file suit." (*Id.* at 833.)

## II.    Analysis

### A.    Standard of Review

The Court applies the arbitrary and capricious standard of review to ERISA claims for denial of benefits if the ERISA plan grants the administrator discretion to determine benefit eligibility or interpret the plan's terms.  Absent discretion, the standard of review is de novo.  *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 709-10 (6th Cir. 2000); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).  Spectrum concedes the administrator has discretion in this case.  Accordingly, the arbitrary and capricious standard of review applies.

The arbitrary and capricious standard of review is highly deferential, but it "does not require [the Court] merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).  The administrator's decision must be "the result of a deliberate, principled reasoning process . . . supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).  The Court will accept the administrator's decision so long as "it is possible to offer a reasoned explanation" for it. *Evans v.*

*UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Perry v. United Food & Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995)).

### B.    Procedural Errors

The procedural errors in this case are numerous.  MBA claimed it understood Spectrum's first letter of appeal to mean only that Spectrum intended to seek payment of rejected charges from the patient.  However, internal documents indicate Spectrum had previously discussed the matter with MBA and asserted that MBA "still owe[d] $62,434.47" (A.R. at 570.) Furthermore, an email dated July 30, 2003, reveals that a representative from Spectrum had spoken with a representative from MBA and informed MBA that Spectrum would fax its letter of appeal. (*Id.* at 558.)  In the prior state court proceeding MBA asserted Spectrum's first letter was also ineffective because Spectrum sent it to Good Samaritan, while the Plan requires appeals be sent to MBA.  MBA did not contest the validity of Spectrum's 2003 appeal in this proceeding.  Its failure to review the claim on appeal in 2003 contravened 29 C.F.R. § 2560.503-1(i)(2)(iii)(A), which provides 60 days to complete the appellate review.

Spectrum requested "a printout containing the charges of the other providers against which [Spectrum] was compared" in its second letter of appeal.  (A.R. at 198.)  MBA never provided Spectrum with the documents used to determine whether Spectrum's charges satisfied the Plan's definition of "reasonable and customary."  (*Id.* at 34.)  Instead, Defendants replied that most providers have access to these sources and that Spectrum could purchase them from the publishers if it did not have them.  Although the Summary Plan Description stated that these sources were available at no cost, Good Samaritan's failure to provide them upon request contravened 29 C.F.R. § 2560.503-1(h)(2)(iii).  This is particularly significant in this case.  Were the claim initially denied because the claimant did not provide sufficient medical evidence to support it, the claimant could

contest the decision by presenting additional evidence of his medical condition. Here, however, Spectrum's appeal rests on its assertion that MBA's use of various sources to determine reasonable and customary charges did not comply with the Plan's definition. MBA invited Spectrum to offer evidence rebutting its determination that Spectrum's charges exceeded the Plan's reasonable and customary guidelines and suggests that Spectrum thwarted the administrative review when it did not supply all the requested information. However, the approach MBA seems to think Spectrum should have taken would not have borne much fruit. Spectrum cannot prevail by offering another, or even a superior, data set. The administrator's interpretation of the Plan need not be the best conceivable; it need only be reasonable. Any evidence of expenses Spectrum may have offered in support of its charges would have been irrelevant, as would evidence that its charges did not exceed the charges of some other set of providers in the area. Such evidence might establish another, potentially superior, comparison set, but it would not invalidate the Defendants'. It is difficult to imagine Spectrum could have convinced Defendants that their determination of reasonable and customary charges did not comply with the Plan's definition absent access to the sources themselves and a detailed understanding of the way MBA used them.

MBA did not complete its appellate review of Spectrum's claim. Furthermore, its time to respond had expired when Spectrum filed suit. 29 C.F.R. § 2560.503-1(i)(1)(i) (providing 60 days to complete appellate review and a 60-day extension if necessary); 29 C.F.R. § 2560.503-1(i)(4) (tolling the time to respond). MBA informed Spectrum it could submit additional materials when it notified Spectrum of its adverse benefit determination after the state court lawsuit. (A.R. at 824.) However, this request was for information Spectrum could use "to perfect its claim for benefits," not for information necessary to decide a claim. (*Id.*) Were the request one for necessary information, it still would not have triggered the tolling provision of § 2560.503-1(i)(4). That

7

provision specifies that the time to complete the administrative appeal "shall be tolled from the date on which the notification of the extension is sent" *if* that time is "extended pursuant to paragraph (i)(1), (i)(2)(iii), or (i)(3) of this section due to a claimant's failure to submit information necessary to decide a claim." Thus, the response time is not tolled because the administrator has requested "necessary" information unless it has also taken an extension because of that request. The extension provisions of (i)(2)(iii) and (i)(3) are inapplicable. The provision of (i)(1)(i) requires the administrator to furnish "written notice of the extension . . . indicat[ing] the special circumstances requiring an extension . . . and the date by which the plan expects to render the determination on review." Good Samaritan did not provide this notice.

On July 17, 2007, MBA requested the medical chart so it could give the claim "full and proper consideration." (A.R. at 801.) This letter stated that its response time would be "temporarily stayed" until the requested information would be received. On August 9, 2007, MBA stated that its request for the medical chart was authorized by (g)(1)(iii) and that this request provided notice of an extension. However, the July 17 letter referred to a stay, not an extension. Even if the Court reads MBA's letters broadly enough to interpret them as notice that it required an extension, neither the July 17 nor the August 9 letters supplied the date required by (i)(1)(i). Consequently, MBA never invoked an extension or triggered the tolling provision of (i)(4).

Even if the Court concludes that MBA's letters complied with the provisions of (i)(1)(i) and (i)(4), the time to respond still expired before Spectrum filed suit. If the July 17 letter extended and tolled the response time, MBA had 6 days remaining when it took the extension. Spectrum sent notice of appeal by Federal Express on May 23, 2007. If MBA received it on the 24th, July 17 was the 54th day. MBA thus had 66 days remaining after the tolling stopped on November 6, 2007. Spectrum filed suit on February 22, 2008, 108 days later.

As of November 6, 2007, MBA had not provided Spectrum notice that the administrative review was completed.  The October 17, 2007, audit report it provided was neither a complete appellate review nor notice of a final determination.  (A.R. at 824.)  This audit was performed by the same individual who conducted the initial analysis in 2003.  (*Id.* at 813.)  MBA had indicated it would "close the administrative record" and decide the appeal on the basis of the information available if Spectrum did not submit the requested information.  (*Id.* at 824.)  On November 6, 2007, Spectrum gave unequivocal notice that it would not do so.  However, an independent examiner never reviewed Spectrum's appeal and MBA never notified Spectrum of a final determination.  MBA's appellate review did not satisfy the deadline of 29 C.F.R. § 2560.503-1(i)(1)(i) and 29 C.F.R. § 2560.503-1(i)(4), the notice requirements of 29 C.F.R. § 2560.503-1(j), or the independent analysis required by 29 C.F.R. § 2560.503-1(h)(3)(iii).  Its failure to employ an examiner who did not "ma[k]e the [initial] adverse benefit determination" is "the most fundamental of procedural defects." *Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d 779, 790 (S.D. Ohio 2008).

### C.      Effect of Procedural Errors

Spectrum argues that the procedural defects of Good Samaritan's claim analysis transmute the standard of review into de novo.  Spectrum cites *Nicholas v. Prudential Ins. Co. of Am.*, 406 F.3d 98 (2nd Cir. 2005), *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1103-1107 (9th Cir. 2003), and *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631-34 (10th Cir. 2005), but does not discuss the facts or holdings of these cases or apply their analyses to the facts of this case.

None of these cases is applicable.  Each of them addresses circumstances in which an ERISA plan administrator failed to respond to an appeal in a timely fashion and the appeal was thus "deemed denied" according to the version of 29 C.F.R. § 2560.503-1(h)(4) then in effect.  These

cases held that when an administrative appeal was deemed denied due to administrative inaction or untimely action, the standard of review was de novo because the administrator had not exercised his discretion. Absent an exercise of discretion they could review under the arbitrary and capricious standard, those courts had little choice but to perform a de novo review of the claims or remand them to the administrator for an ERISA-compliant analysis.

Effective Jan. 1, 2002 the regulations were amended. The "deemed denied" language was stricken. The amended regulations specify that if a plan fails "to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies . . . ." 29 C.F.R. § 2560.503-1(l) (2002). Under the current regulatory scheme, Spectrum's claim is deemed exhausted rather than denied.

It appears that the rationale which justified subjecting a claim deemed denied under the previous regulations to de novo review could apply with equal force in some instances to a claim deemed exhausted under the amended version. The Sixth Circuit has used a substantial compliance test to avoid "unjust reversals o[f] a claim decision due to a minor procedural defect." *Pitts*, 534 F. Supp. 2d at 790. Good Samaritan's failure to employ an independent examiner was a fundamental defect, not a minor defect. The Sixth Circuit has excused only failures to comply with ERISA's notice requirements on the basis of substantial compliance. *Id.* However, none of the cases Spectrum cites in which a claim deemed denied was subjected to de novo review are from the Sixth Circuit. Furthermore, they are disability cases. That some courts have applied de novo review to disability claims deemed denied does not mean this Court should apply the same standard to health benefits claims. Reversing the denial of health insurance benefits is a more extreme measure than reversing the denial of previously granted disability benefits; in contrast to health benefits, disability benefits once granted may be terminated in the future should the beneficiary no longer be disabled.

10

Finally, the Sixth Circuit has never regarded *VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 615 (6th Cir. 1992), and its progeny as establishing that de novo review is appropriate when a claim is deemed denied or exhausted. *Univ. Hosps. of Cleveland v. South Lorain Merchs. Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 434-35 (6th Cir. 2006) (discussing *VanderKlok*); *Soltysiak v. Unum Provident Corp.*, 2006 WL 2884461, at *2 (W.D. Mich. Oct. 10, 2006). The Sixth Circuit has never subjected a claim to de novo review on the basis of procedural error. Consequently, the Court will apply the arbitrary and capricious standard even though Good Samaritan's procedural errors were numerous and fundamental.

The Court must decide how to remedy these errors. The Court may remand the case to the Plan administrator for a full and fair review of Spectrum's claim, or determine itself whether Spectrum is entitled to benefits. *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 621-22 (6th Cir. 2006). The Sixth Circuit has held that where the "'problem is with the integrity of [the plan's] decision-making process' rather than" with the plan's substantive decision itself, "the appropriate remedy . . . is remand to the plan administrator." *Id.* at 622 (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005)). The *Elliot* court remanded to the administrator rather than award benefits itself because the plaintiff was not clearly entitled to benefits. *Elliot*, 473 F.3d at 622. That court was unwilling to award benefits merely because the plan's decision to deny them was arbitrary and capricious. One thus might conclude that if this Court finds Defendants' denial arbitrary and capricious, it should also remand Spectrum's claim to the Plan for a full and fair review unless it determines that Spectrum is clearly entitled to benefits on the merits of its claim.

The Court disagrees with such an interpretation because it fails to consider the contexts of the instant claim and the claim in *Elliot* and the allocation of the burden of proof. *Elliot* concerned a claim for disability benefits. Elliot bore the burden of proving she was disabled. This case

involves a claim for health benefits.  Defendants do not dispute that the care Spectrum provided is covered by the Plan.  Consequently, Spectrum is entitled to benefits unless Defendants demonstrate that an exclusion applies.  If the Court determines Defendants' decision was arbitrary and capricious, *ipso facto* Defendants have failed to offer sufficient evidence that their determination that an exclusion applied was reasonable.  Consequently, the Court will not remand Spectrum's claim to the administrator should it find MBA's decision arbitrary and capricious.  This is consistent with *Schwartz v. Oxford Health Plans, Inc.*, 175 F. Supp. 2d 581 (S.D.N.Y. 2001), in which health benefits that had been denied previously on the grounds that the charges exceeded the reasonable and customary guidelines were awarded.

### D.    Spectrum's Claim for Benefits

Good Samaritan denied some of the charges Spectrum submitted for payment because it determined those charges exceeded the Plan's definition of reasonable and customary charges. Reasonable and customary charges are:

> the usual charge[s] made by a physician or supplier of services, medicine or supplies and shall not exceed the general level of charges made by others rendering or furnishing the same such services, medicines or supplies within the area in which the charge is incurred for the injury or illness being treated. . . .  The term "area" as it would apply to any particular service, medicine or supply means a county or such greater areas as is necessary to obtain a representative cross section of level of charges.

(A.R. at 34.)  Good Samaritan enumerated eight reasons the denied charges were not reasonable and customary: A) Appears to be error in billing; B) Reduced to 200% of Average Wholesale Price if AWP < $100.00, and 110% of AWP if AWP > $100.00; C) Reduced to list price + 10%; D) Reduced to 90th percentile for geographic region; E) Reduced to Usual, Reasonable and Customary (URC); G) Unbundling (Item/Service is customarily included in department charge); H) Reasonable price would be cost + 10%.  Please supply item invoice; J) Unable to identify item.  Please provide

detailed documentation.  (*Id.* at 495.)  On administrative appeal, Good Samaritan audited the medical record and rejected some charges previously accepted for a ninth reason: K) Quantity change due to audit of medical record.  (*Id.* at 811, 823.)  MBA did not rely on reason codes "H" and "J."  (*Id.* at 70-78, 825-32.)

### 1.    Alleged Billing Errors (Reason code "A")

Good Samaritan contends Spectrum did not challenge the denial of benefits on the grounds of billing errors; consequently, it argues Spectrum may not challenge the denial of benefits on those grounds now.  This is incorrect.  Spectrum challenged Good Samaritan's assertion that certain charges appeared to be the result of billing errors (reason code "A").  (*Id.* at 87-88.)  It informed Good Samaritan a nurse auditor had reviewed numerous randomly selected allegedly erroneous charges and found them to be billed correctly with two de minimis exceptions.  (*Id.*)  Spectrum also explained that items which appeared to be billed at two different rates were billed correctly.  The prices for those items changed during the patient's stay and they were billed accordingly.  (*Id.* at 88.)  Good Samaritan's outside auditor, Mr. Frost of PPG, later wrote that Spectrum's "charge master has problems (charging more than one price for the same drug - not justifiable in my opinion)."  (*Id.* at 813.)  The Court questions whether Good Samaritan gave Spectrum's response regarding these alleged errors reasoned consideration.  However, on administrative appeal MBA did not rely on reason code "A".  Many of the charges originally rejected for this reason were instead rejected on different grounds - reason code "K."  (*Id.* at 70-78, 825-32.)  MBA also used reason code "K" to deny charges it previously granted.  MBA invited Spectrum to submit additional information to contest this.  Spectrum declined.  Normally, this would constitute a waiver.  However, MBA's procedural errors were numerous.  Spectrum may have believed MBA would not provide it a full and fair review.  In light of these errors, particularly MBA's attempt to deny charges previously

13

accepted, its failure to complete the administrative review, and its reliance on the same auditor who conducted the initial review, Spectrum's decision was reasonable. A claimant is entitled to submit additional evidence when the administrator "fail[s] to follow administrative review procedures." *VanderKlok*, 956 F.2d at 617. Spectrum may augment the administrative record and contest the use of reason code "K."

### 2. Bundled Charges (Reason Code "G")

MBA denied some charges it asserts were billed twice as a result of bundling. Bundling is the inclusion of a particular charge within a department charge. MBA alleges some charges that are usually included within department charges were also billed separately. MBA relied on a standard billing form, the UB92, to make this determination. According to MBA, "the American Medical Association [] has issued detailed guidelines about what should and what should not be included in a department charge. MBA utilize[d] . . . the AMA's guidelines to determine when a medical care provider has double-billed for a particular product or service." (A.R. at 429-30.) Spectrum has provided no evidence that charges denied on this basis were not included in various department charges. MBA's reliance upon industry-standard guidelines to determine if a particular charge was also included in a department charge was reasonable. Consequently, Spectrum is not awarded benefits denied on the basis of reason code "G."

### 3. Reasonable and Customary Charges (Reason Codes "B", "C", "D" and "E")

MBA's reliance on reason codes "B", "C", "D" and "E" does not satisfy the Plan's definition of reasonable and customary charges. Reason "B" uses an item's average wholesale price to determine acceptable prices. Reason "C" uses an item's list price; Reason "D" uses the 90th percentile for the geographic region, and Reason "E" reduces a charge to a "usual, reasonable and customary" value. (*Id.* at 78.)

14

MBA should not have used wholesale or list prices to determine whether a particular charge is reasonable and customary.  The Plan's definition requires Spectrum's charges be compared with the charges (not costs) of other providers of "the same such services, medicine, or supplies within the area in which the charge is incurred for the illness or injury being treated." (*Id.* at 34.)  The phrase "for the illness or injury being treated" is surplusage if it is understood only to modify "the charge [which] is incurred."  According to such an interpretation, the meaning of the passage is identical if that clause is stricken.  It must be understood to modify the "general level of charges . . . within the area."  The comparators must be the amount others charge for medicine, services or supplies to treat the illness or injury in question.

This interpretation is required not only by the text, but also by common sense.  Patients are treated by retail health care providers.  Comparing retail charges to the charges at an earlier point in the distribution chain would be arbitrary and permit MBA to limit allowable charges to the charges made by the manufacturers themselves.  Furthermore, the use of wholesale costs does not establish a representative cross section of charges; patients purchase health care from physicians, hospitals and pharmacies, not supply manufacturers or wholesalers.  Although Spectrum may well have paid these wholesale prices, MBA has provided no evidence that these wholesale prices represent the charges of other retail health care providers, nor is there reason to believe that they do.  Accordingly, the Court finds the use of wholesale and list prices to be arbitrary and capricious and awards Spectrum all benefits denied on account of reason codes "B" and "C".

MBA determines the 90th percentile for the geographic region using the Physicians' Fee Reference (PFR), a nationwide compendium of charges made by physicians, organized by zip code.  MBA's reliance on the 90th percentile of charges made by other physicians is certainly reasonable.  However, the data it used did not encompass the geographic area required by the Plan.  MBA

15

revealed it used the PFR to determine charges in the 49508 zip code.  (*Id.* at 428.)  When there were insufficient providers to obtain a sufficient sample size it expanded the area using the zip codes that began with 495 and 494.  (*Id.* at 429.)  The Plan defines the applicable area as "a county or such greater areas as is necessary to obtain a representative cross section." (*Id.* at 34.)  This language is subject to multiple interpretations.  For instance, must the area be contiguous?  Must the area encompass all of a particular county?  Is it permissible to use several noncontiguous areas so long as their combined area exceeds the area of the county?  A number of answers to these questions could be reasonable, and any reasonable interpretation would survive an arbitrary and capricious analysis.  However, the 49508 zip code cannot satisfy the definition no matter how it is interpreted. The area covered by the 49508 zip code is but a fraction of the size of any county in Spectrum's vicinity.  For example, the major Spectrum facility is two blocks from this courthouse, and this courthouse's zip code is 49503.  The undersigned judge's residence with a zip code of 49546 is within Spectrum's area of primary coverage.

Using all zip codes beginning with 495 and 494 while excluding those beginning with 493 also fails to satisfy the Plan's definition.  The 494 zip codes include regions as far away as 100 miles northwest of Grand Rapids.  For instance, Ludington, Michigan, a city of approximately 8,000 people on the shore of Lake Michigan, is in the 49431 zip code.  Ludington is not within the Grand Rapids metropolitan area, and people in Ludington would more likely look to Ludington, Muskegon, or Manistee for their primary health care.  Even the most generous conceivable conception  of a metropolitan area including Grand Rapids, the Grand Rapids-Muskegon-Holland Combined Statistical Area defined by the Census Bureau, does not include Ludington or more than 500 square miles covered by the 494 zip codes.  Furthermore, even the narrowest definitions of metropolitan Grand Rapids comprise significant portions of the 493 zip codes, yet MBA did not include any of

16

these areas.  MBA's decision to use remote 494 zip codes and exclude nearby portions of metropolitan Grand Rapids was arbitrary and fails to provide a representative cross section of charges as required by the Plan.  As such, it was an abuse of discretion.  The Court will therefore award Spectrum all charges denied on the basis of reason code "D."

MBA states that PPG has developed its own nationwide database establishing "usual, reasonable, and customary" charges through its experience auditing the charges of numerous medical care providers.  (*Id.* at 429.)  MBA used this data to determine that the charges rejected for reason code "E" exceeded the "usual, reasonable, and customary" amounts charged by other providers.  Reliance on this database may well be appropriate.  (*Id.*)  However, MBA has not demonstrated that the values it established comply with the Plan's definition of reasonable and customary charges.  For instance, MBA did not indicate the percentile at which it established the maximum permissible charge.  Furthermore, MBA has not shown that the geographic area covered by the data subset it used complies with the Plan.  Absent such information, MBA cannot provide a reasoned explanation for its decision to reject charges on this basis.  This error is compounded by the fact that MBA did not provide Spectrum access to this source.  The other sources MBA refused to provide Spectrum are publicly available; an internal database is not.  Spectrum could not challenge MBA's decision to reject these charges without access to the data with which these charges were compared.  For these reasons, Spectrum is entitled to benefits denied on the basis of reason code "E."

### E.    Counterclaim

Defendants seek the return of $35,632.47 they claim they overpaid Spectrum.  The Plan provides that if the "benefits [paid] under this Plan [] are in excess of the benefits that should have been paid . . . the Plan Administrator may . . . deduct[] . . . the amount of [the overpayment] or . .

. recover such [excess] amount . . . by any other legal method." (A.R. at 47.)  ERISA § 502(a)(3)

permits a "participant, beneficiary, or fiduciary to enjoin any act or practice which violates . . . the

terms of the plan, or to obtain other appropriate equitable relief to redress such violations."  29

U.S.C. § 1132(a)(3).  The equitable relief available in § 502(a)(3) includes only "those categories

of relief that were typically available in equity."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113

S. Ct. 2063, 2069 (1993).  It does not comprise all "relief a court of equity is empowered to provide

in a particular case."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S. Ct.

708, 712 (2002).

 Not all claims of unjust enrichment or requests for restitution are equitable.  Restitution,

though "typically available in equity," was also available historically at law.  *Id.*  An equitable claim

for restitution seeks to impose a constructive trust or an equitable lien.  *Id.* at 214.  The Court may

impose a constructive trust or an equitable lien when one demonstrates it has an equitable or

beneficial interest in particular property held by another who "cannot in good conscience retain or

withhold" it.  4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1044 (5th ed. 1941).

This may be through actual or constructive fraud or breach of the duty to act in good faith.  *Id.*

 These principles of equity are applied in *Sereboff v. Mid-Atlantic Medical Services, Inc.*, 547

U.S. 356, 126 S. Ct. 1869 (2006).  In *Sereboff*, the beneficiaries of an ERISA health insurance plan

retained the proceeds of their settlement with the tortfeasor who injured them.  The ERISA plan

required them to reimburse the administrator for any recovery from a third party, up to the amount

of benefits paid.  The *Sereboff* Court held that the plan created an equitable lien by assignment of

the third-party benefits.   The *Sereboff* plan "identified a particular fund" when it assigned

"recoveries from a third party" to the administrator.  The administrator thus held an equitable

interest in a specific res.  The plan also designated "a particular share of the fund" the administrator

was entitled to - "that portion of the total recovery which is due for benefits paid." Consequently, the administrator satisfied all the requisites of an equitable lien, though it never had title to the fund and thus could not trace the flow of property it originally possessed to assets held by the plan beneficiary.

MBA claims it erroneously paid Spectrum more than Spectrum was due. This claim differs from the claim in *Sereboff* because the administrator in *Sereboff* asserted an equitable claim to a payment the beneficiaries received from a third party. The beneficiaries in *Sereboff* violated their duty to the administrator when they retained those funds. This wrongful retention breached the beneficiaries' obligation to act in good faith. Money paid in excess of the amount due by mistake is also the proper subject of an equitable lien. *Restatement of Restitution* § 20 (1937); 4 Pomeroy, *supra*, § 1047. However, MBA does not claim it paid Spectrum more than it should have by mistake. The essence of the counterclaim is that MBA seeks to determine benefits due differently than when it processed Spectrum's claim five years ago. (A.R. at 810.) When MBA audited Spectrum's claim in 2003 and again in 2006, it did not request the patient's medical chart. MBA did not request the chart until it began to review Spectrum's claim on administrative appeal. Using the medical chart, MBA adjusted the room rate to reflect the hospital's "cost to charge" as the patient's condition improved and her status was upgraded. (*Id.* at 811.) Internal correspondence between PPG and MBA during the appellate review revealed that it "*now* do[es] [this] as a matter of protocol." (*Id.* (emphasis added).) The implication is clear - MBA did not request the medical chart in 2003 or 2006 because its protocol at the time did not require it. This is not an attempt to recover an overpayment made by mistake; it is an attempt to change the rules by which benefits were calculated. The parties dispute the benefits due. Consequently, Spectrum's retention of the alleged overpayment does not constitute the sort of inequitable conduct that would justify the imposition of an equitable lien. Defendants' counterclaim is merely one at law for restitution.

19

Even if Defendants' counterclaim alleged a mistaken overpayment, it would not be a request for equitable relief. A claim for restitution of a mistaken overpayment can be one for equitable relief. *Restatement, supra*, § 20 (1937); 4 Pomeroy, *supra*, § 1047. Here, however, the Plan itself prohibits this classification. The Plan permits the administrator to "deduct[] . . . the amount . . . or . . . recover such amount." (A.R. at 47.) The Plan does not create an equitable interest in the overpayment itself; it gives the administrator the right to recover the *amount* of the overpayment. Rather than establish an equitable lien, the Plan establishes a claim at law for money damages.

Furthermore, Defendants' counterclaim would fail even if it were a request for an equitable remedy. During administrative appeal MBA requested information it previously chose to ignore. It used this information to deny benefits previously granted by applying a different auditing protocol. Those benefits were not subject to periodic review, and its decision was procedurally improper. An appeal of an adverse benefit determination necessarily comprises only those benefits that were denied. 29 C.F.R. § 2560.503-1(h)(1) (requiring a plan to "maintain a procedure" for "appeal[ing] an adverse benefit determination"). The Plan itself provides for review of "denied claims" and specifies that on appeal, the administrator will "review the decision denying the claim." (A.R. at 50.) Only denied benefits are subject to review on appeal. No Plan provision authorizes the reconsideration of previously awarded health benefits. MBA's attempt to do so is barred whether it seeks to recover an alleged overpayment or offset an award the Court may grant.

### F.      Attorney's Fees

Spectrum and Defendants have requested attorney's fees. ERISA permits the Court to grant "reasonable attorney's fee[s] and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Court considers five factors when deciding whether to award attorney's fees: 1) the degree of the opposing party's culpability or bad faith; 2) its ability to satisfy an award; 3) the award's deterrence on others

in similar circumstances; 4) whether the requesting party sought to resolve significant questions of ERISA law or confer a common benefit on the plan's participants and beneficiaries; and 5) the relative merits of the parties' positions. *Sec'y of the Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985).

### 1.       Culpability or Bad Faith

The Defendants bear a high degree of culpability for the profusive errors which infected their procedure from the beginning.  Five years after it arose, MBA has yet to complete an appellate review of Spectrum's claim. MBA refused to begin a review until the state court ordered it.  MBA did not respond to Spectrum's July 2003 letter of appeal and waited four months to respond to Spectrum's December 2003 letter.  In the state court proceeding, MBA argued that Spectrum sent its first letter to the wrong party.  However, MBA's claim that it did not receive the letter is belied by its April 2004 response.  In that letter MBA did not claim it never received Spectrum's first letter. Instead, it wrote that Spectrum's first letter was a protest letter, not an appeal.

MBA did not complete the review it began pursuant to the state court's order.  MBA never provided the sources it used to determine reasonable and customary charges, despite Spectrum's request in December 2003.  The review it finally undertook was neither full nor fair.  MBA used the review to deny benefits it had awarded years earlier.  It was performed by the same auditor who conducted the initial audit who, obviously, has a motive to justify his first audit.  Finally, MBA did not complete the review after Spectrum informed MBA it would not submit additional materials, even though MBA had previously stated that if Spectrum declined it would close the administrative review and complete the audit using the information available.  In this Court's judgment, the number and magnitude of these errors constituted bad faith.  The Court does not believe that MBA's misuse of its sources to determine reasonable and customary charges was the result of bad faith.  This misuse, however, contributes to MBA's culpability.

### 2.   Defendants' Ability to Pay

No evidence suggests the Defendants will be unable to satisfy an award of attorney's fees. Defendants provide benefits to numerous employees of multiple employers and have already paid Spectrum over $318,000 in health benefits.  The Court finds that Defendants can satisfy an award of attorney's fees.

### 3.   Deterrence

The Court considers an award's deterrence, not only on the Defendants, but also on others similarly situated.  *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 531 (6th Cir. 2008).  Considering the number of claims that an administrator must process, procedural defects are probably common. But, in any case, it is important that insurers and administrators be careful in making their determinations.  An award of attorney's fees will likely deter ERISA plans from bad-faith denials and encourage them to follow required procedures so claims may receive a full and fair review.

### 4.   Does Spectrum Seek to Confer Common Benefits or Resolve a Significant Question of ERISA Law?

Many plan participants are likely to benefit from the deterrence of procedural defects. However, this factor requires that the party *seek* to confer benefits, not merely confer them.  The Sixth Circuit has explained that "the deterrent-effect and common-benefit factors are separate inquiries."  *Gaeth*, 538 F.3d 524, 533 (6th Cir. 2008).  Universal deterrence will not satisfy this factor if the deterrence is merely an incident of the litigation rather than one of its objectives. Accordingly, the Court finds that Spectrum did not seek to confer common benefits to the other plan participants or beneficiaries.

Likewise, the Court finds that Spectrum did not resolve or seek to resolve a significant question of ERISA law.  The most significant question posed by this case is whether a plan's attempt

to recover an alleged overpayment arising from its determination on appellate review that it could award the claimant fewer benefits using a different auditing protocol than it used initially qualifies as equitable relief.  Though this may have been a question of first impression in the Sixth Circuit, it could be regarded as the mere application of the principles established in *Knudson* and *Sereboff* to different circumstances - an overpayment arising not from third-party payments but from benefits the plan concluded on appeal could have been reduced.  Furthermore, this issue arose from Defendants' counterclaim, and thus was not one Spectrum sought to address.

### 5.      Relative Merits of the Parties' Positions

Finally, the Court must evaluate the relative merits of the parties' positions.  Unfortunately, the precise meaning of this phrase is a little fuzzy.  The Court is inclined to think the prevailing party's position is usually more meritorious.  However, were this all the analysis required this factor would probably be more appropriately phrased, "did the requesting party prevail?"  Perhaps it is more helpful to consider whether one party's position was unreasonable.  The Sixth Circuit considered the defendant's arbitrary and capricious decision as well as its high degree of culpability in determining its position was less meritorious than the plaintiff's in *Moon v. Unum Provident Corp.*, 461 F.3d 639, 645 (6th Cir. 2006).  The Court finds that Defendants' refusal to conduct the initial appellate review, failure to provide Spectrum the requested source materials, reliance on the auditor who conducted the initial review to conduct the appellate review, and failure to complete the appellate review were unreasonable.  These defects contribute, as well, to Defendants' culpability and the arbitrary and capricious nature of their decision.  Whether one regards the questions of culpability and arbitrariness as separate from, or part and parcel of whether, Defendants' position was unreasonable, the Court finds Spectrum's position more meritorious than Defendants'.

23

Having found four of the five factors favor an award of fees, the Court will award Spectrum its reasonable attorneys' fees.

**III.      Conclusion**

The Court has been asked to determine whether Defendants' decision to deny a portion of Spectrum's claim was arbitrary and capricious.  It was.  Their reliance on reason codes "B", "C","D" and "E" did not satisfy the Plan's definition of reasonable and customary charges.  The Court has also been asked to determine whether Defendants' counterclaim requests equitable relief. Defendants' request for restitution is a claim at law, not equity.  Furthermore, Defendants' attempt to deny on appeal benefits previously granted is prohibited by the Plan and federal regulations. Finally, the Court agrees with Plaintiff that the circumstances merit an award of attorneys' fees.

A separate Order will issue.


Dated:  December 11, 2008                          _____/s/ Gordon J. Quist_____
                                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE